IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| MICHAEL GAY, | ) | CASE NO. 1:20CV180 |
| | ) | |
| Plaintiff, | ) | |
| | ) | JUDGE SARA LIOI |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

Plaintiff Michael Gay ("Gay") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying his application for Disability Insurance Benefits ("DIB"). Doc. 1. This Court has jurisdiction pursuant to 42 U.S.C. § 405(g). This matter has been referred to the undersigned Magistrate Judge for a Report and Recommendation pursuant to Local Rule 72.2(b)(1).

For the reasons stated below, the undersigned recommends that the Commissioner's decision be **AFFIRMED**.

## I. Procedural History

Gay filed an application for DIB in November 2015, alleging a disability onset date of May 6, 2015. Tr. 166, 106. He alleged disability based on the following: bipolar, agoraphobia, anxiety, and depression. Tr. 193. After denials by the state agency initially (Tr. 86) and on reconsideration (Tr. 102), Gay requested an administrative hearing. Tr. 127. A hearing was held before an Administrative Law Judge ("ALJ") on August 1, 2017. Tr. 23-72. In his December 5, 2018, decision (Tr. 106-115), the ALJ determined that there are jobs that exist in significant numbers in the national economy that Gay can perform, i.e., he is not disabled. Tr. 114-115.

Gay requested review of the ALJ's decision by the Appeals Council (Tr. 157) and the Appeals Council granted review (Tr. 4).  Gay submitted a statement to the Appeals Council, and on December 2, 2019, the Appeals Council notified Gay that it did not find a basis for changing the ALJ's decision.  The Appeals Council adopted the ALJ's decision, making the Appeals Council's decision the final decision of the Commissioner.  Tr. 4-6.

## II. Evidence

### A. Personal and Vocational Evidence

Gay was born in 1972 and was 42 years old on the alleged onset date.  Tr. 114.  He has a high school education and previously worked as a groundskeeper.  Tr. 28, 67.

### B. Relevant Medical Evidence

On May 30, 2015, Gay saw his primary care physician, Dr. Butrey, M.D., for anxiety. Tr. 257.  He reported having panic attacks and stated that his medication, Xanax, had not been helping as much lately.  Tr. 257.  Upon exam, Gay had a normal affect and was fully oriented, well-nourished, and well-developed.  Tr. 258.  He was diagnosed with bipolar disorder.  Tr. 259. He was referred to behavioral health and Zyprexa was added to his medications.  Tr. 258.  At a follow-up visit on June 18, Gay was noted to have "significant relief" with Xanax and Zyprexa. Tr. 253.

On August 5, 2015, Gay saw Dr. Butrey for medication refills.  Tr. 248.  He stated that the onset of his anxiety had begun more than a year prior to his visit and that progression since then had waxed and waned.  Tr. 248.  He experienced moderate relief with Xanax and denied behavioral problems or sleep disturbances.  Tr. 248-249.  Upon exam, he had a normal affect, orientation, and appearance.  Tr. 249.  On September 2, Gay returned for a Xanax refill.  Tr. 241. Regarding his anxiety, Gay reported getting jittery and having a funny feeling in his stomach;

regarding his bipolar, he stated that he had been good and had had no manic issues.  Tr. 243.  He was "much improved."  Tr. 243.  Upon exam, he had a normal affect, orientation, and appearance and Dr. Butrey described his anxiety and bipolar disorders as "stable."  Tr. 243-244.

On September 29, 2015, Gay saw licensed social worker Ms. Pietz for an initial counseling assessment.  Tr. 558.  His chief complaint was becoming physically ill when he had to leave his house and being unable to work.  Tr. 558.  He described being confined to his home most of the time due to agoraphobia.  Tr. 558.  He was just beginning to acknowledge that his symptoms may be anxiety related, whereas he previously believed he had an undiagnosed medical condition.  Tr. 558.  He reported having a good relationship with his partner and son and being able to get along well with people he knows.  Tr. 559.  Upon exam, he had attentive and friendly behavior, appropriate eye contact, coherent speech, normal thought processes and thought content, "good" memory, average intelligence, and fair insight and judgment.  Tr. 560.  His mood was anxious and irritable and his affect was appropriate to content and anxious.  Tr. 560.  He was diagnosed with agoraphobia.  Tr. 560.

On October 13, 2015, Gay saw Pietz complaining of his mind racing.  Tr. 556.  He had driven to the appointment on his own and reported going for walks in the morning prior to full daylight so he would not be seen.  Tr. 556.  He comprehended the irrationality of his thinking but was unable to control his thoughts.  Tr. 556.  Pietz suggested he go to the Metro Parks to walk in the morning with his wife, going further each day, and gave him a list of CDs to aid him in reducing his anxiety.  Tr. 556.  Pietz diagnosed agoraphobia with panic disorder.  Tr. 557.

On October 20, 2015, Gay saw registered nurse practitioner Ms. Harrison for a psychiatric evaluation.  Tr. 300.  He complained of depression and anxiety with symptoms such as sadness, irritability, depression, anger, agitation, and poor frustration tolerance, and chronic

worry with panic attacks.  Tr. 300.  He reported having a lot of difficulty leaving his house and having stopped working due to not being able to cope with his symptoms.  Tr. 300.  In the past he had tried the medication Buspar, which did not help his symptoms, and Risperdal, which made him feel suicidal.  Tr. 300.  Upon exam, he was well-groomed, sunburned, fully oriented, and cooperative.  Tr. 379.  He had normal speech, an anxious and depressed mood, and he showed extreme anxiety, at times laughing inappropriately, and was agitated and restless.  Tr. 379.  His thought content was normal, his memory was impaired (which Harrison attributed to concentration problems), he had no deficits in his cognition or fund of knowledge, and his insight and judgment were good.  Tr. 379-380.  Harrison recommended therapy and assessed generalized anxiety with compulsiveness and social anxiety; panic disorder with agoraphobia; and a mood disorder which is likely bipolar disorder.  Tr. 302.  She continued his Zyprexa because Gay said it really helped his mood; switched his Xanax to Clonazepam for longer action; and added Lamictal.  Tr. 302.

On November 4, 2015, Gay returned to Ms. Pietz and reported that he had had two days of deep depression with suicidal thinking but now felt better.  Tr. 554.  He stated that he continued to have ruminative thinking and was waking in the early morning.  Tr. 554.  On November 5, Gay saw Ms. Harrison and told her about an acute depressive episode he had since his last appointment.  Tr. 319.  He explained that he had brought out a gun (now in safekeeping at his parents' house) and was seriously thinking about ending his life.  Tr. 319.  He also stated that he had been unable to get his Zyprexa at that time, due to a problem at the pharmacy.  Tr. 319.  He was back on his Zyprexa at an increased dose and felt a little better but was still depressed and anxious.  Tr. 319.  He felt that Xanax had worked better for him.  Tr. 319.  Harrison kept him on the increased dose of Zyprexa, switched him back to Xanax, and started

him on an anti-depressant, Paxil.  Tr. 319.

On November 18, 2015, Gay saw Ms. Pietz.  Tr. 552.  He reiterated his struggles with agoraphobia.  Tr. 552.  He had not been walking.  Tr. 552.  He stated that he felt that everyone was looking at him and that someone was walking behind him.  Tr. 552.  He visited family in southern Ohio for 2 ½ days and his sleep had improved.  Tr. 552.  He rarely left the house but "manage[d] to get to appointments."  Tr. 552.

On December 3, 2015, Gay returned to Harrison and reported decreased anxiety and remitted depressive symptoms, but he still had extreme anxiety in social situations and difficulty leaving his home.  Tr. 316.  He also had racing thoughts and restlessness.  Tr. 317.  Harrison adjusted his medications.  Tr. 317.

On December 31, 2015, Gay saw Harrison and reported that the medication changes had been helpful and that, for the most part, while at home he was a lot less symptomatic and more comfortable.  Tr. 314.  But he had had a very difficult time on Christmas at his parents and he had to leave.  Tr. 314.  He described his symptoms as racing thoughts and heart rate, feeling nauseous and having to pace, and segregating himself from others.  Tr. 314.  He had a difficult time coming to the appointment that day.  Tr. 314.  Harrison noted his reports of two serious anxiety attacks and that two days a week he had anxiety and depression so bad he could not get off the couch.  Tr. 314.  However, he did endorse improvement overall since his last visit.  Tr. 314.  Harrison increased his medications.  Tr. 314.

On January 28, 2016, Gay returned to Harrison and reported no benefit from the increased Paxil.  Tr. 312.  He had experienced three "really dark days" where he had suicidal thoughts and stayed in his room for most of the day.  Tr. 312.  He felt the Xanax was better at controlling his anxiety when he took it during the day.  Tr. 312.  Harrison noted that, while Gay's

symptoms had decreased, he still had unacceptable levels of unremitted depression and anxiety. Tr. 312.  She decreased his Paxil and increased his Zyprexa and Xanax.  Tr. 312.

On March 10, 2016, Gay saw nurse practitioner Mr. Sawyer and reported difficulty sleeping at night and having energy rushes.  Tr. 308.  His mood stability had improved with Lamictal.  Tr. 308.  His medication adherence was described as good and his medications were adjusted.  Tr. 308.

On April 12, 2016, Gay returned for counseling and saw registered nurse Kate Boldan. Tr. 306.  He reported that he continued to have depression and anxiety, rated 8/10, with no change since his last visit.  Tr. 306.  He reported getting so anxious that he locks himself in his room for days at a time and vomits when he is around crowds.  Tr. 306.  He also endorsed hypomanic episodes lasting three days at a time.  Tr. 306.  He stated that his depression and anxiety started three to four years ago out of the blue.  Tr. 306.

On July 26, 2016, Gay returned for counseling and stated that his depression was better. Tr. 674.  He had started using a CPAP machine and his sleep was better; he felt better and was waking up more rested, although he still felt worn out.  Tr. 674.  It was very hard for him to leave the house.  Tr. 674.  He was still having symptoms of social phobia and anxiety.  Tr. 674. He was very anxious about an upcoming court date about a car accident that occurred while he was driving to pick up his CPAP machine.  Tr. 674.  His medications were adjusted.  Tr. 674.

On August 8, 2016, Gay saw nurse practitioner Ms. Skul for counseling.  Tr. 678.  Skul noted that his medication adherence was poor and that he was only taking Lamictal.  Tr. 678.  He reported a "small" decrease in his anxiety, his mood was "blah," and he had no motivation.  Tr. 678.

On August 29, 2016, Gay complained to Skul of overwhelming anxiety and appeared

severely anxious, shaking and restless.  Tr. 576.  He had had his court date and won his case.  Tr. 576.  His wife had recently had surgery and when she was in the hospital, he reported experiencing suicidal thoughts intermittently, with no plan.  Tr. 576.  He no longer felt that way.  Tr. 576.  He continued to feel as though people were watching him or that someone was behind him when he left the house.  Tr. 576.  His Lexapro was increased.  Tr. 577.  At his counseling session later that same day, he showed "some" anxiety symptoms but stated that he was "in a decent mood."  Tr. 579.  He stated that his anxiety had been "up and down but he had been dealing with it quite fair."  Tr. 580.  He identified his stressors: going to court for his case and his wife's surgery.  Tr. 580.  He had been sleeping well.  Tr. 580.

On September 28, 2016, Gay saw Skul.  Tr. 573.  He had been vomiting in the morning and he was being followed by GI and treated for ulcer prevention.  Tr. 573.  He stated that, overall, he felt about the same.  Tr. 573.  His energy and motivation were poor, he had passive thoughts of death, and he was paranoid when he went outside.  Tr. 573.  His medication was adjusted, including starting Abilify.  Tr. 574.

On October 20, 2016, Gay's wife called at the last minute to cancel his appointment due to his anxiety which rendered him unable to leave the house.  Tr. 569.

On November 14, 2016, Gay saw Skul and reported that he continued to be anxious and irritable and "quite mean."  Tr. 566.  He had a depressed mood and a lack of motivation; although his energy had improved, he felt restless.  Tr. 566.

On December 12, 2016, Gay returned to Skul for counseling.  Tr. 563.  He had stressors that included the death of individuals close to him.  Tr. 563.  He continued to struggle with anxiety and depression, his appetite had decreased, and he had passive thoughts of death.  Tr. 563.

On April 18, 2017, Gay spoke to his case manager and reported severe anxiety.  Tr. 619. The next day, he saw Nurse Skul and stated that he was overly anxious and stayed at home.  Tr. 637.  He was shaking intermittently with nerves and he "refuses to go out and do simple things such as grocery shopping, etc."  Tr. 637.  He felt hopeless, his mood was depressed, he had crying spells about once a week, and thoughts of death intermittently.  Tr. 637.  He had gone to visit family over the weekend and had forgotten his medication; he then began to feel suicidal and go through withdrawal symptoms.  Tr. 637.  He felt anxious "all day every day" and reported panic attacks about every two days, especially when he may need to leave the house.  Tr. 638. His medication was adjusted.  Tr. 638.

### C. Opinion Evidence

#### 1. Treating Source

On October 20, 2015, Nurse Harrison wrote a letter in which she stated that Gay had not worked for three years, had great difficulty leaving his home due to severe and chronic anxiety, had just begun treatment, and was not "employable" for at least six months.  Tr. 550.

On February 10, 2016, Nurse Harrison completed a questionnaire on behalf of Gay.  Tr. 287-288.  She had seen Gay for four months and indicated that his symptoms had greatly worsened over the last three years.  His symptoms included chronic panic attacks, great difficulty leaving his house, chronic worry and apprehension, severe depression, agitation, withdrawal, and difficulty sleeping.  She opined that Gay "would find it difficult" to leave his home and had impairments in the following areas: concentration, memory, ability to manage stress, and ability to sustain attention.  He was receiving "regular counseling with some good effect" and was very compliant with treatment.

On May 10, 2017, Nurse Skul completed a Mental Residual Functional Capacity

questionnaire on behalf of Gay.  Tr. 685-690.  She stated that she first saw Gay in October 2015.

She listed his clinical findings: visibly anxious, tremors/shaking, and poor eye contact.  His

diagnoses were listed as bipolar disorder, generalized anxiety disorder, and agoraphobia.  His

prognosis was uncertain as he had not been able to be stabilized.  Tr. 685.  His symptoms

included anhedonia, appetite disturbance, decreased energy, thoughts of suicide, generalized

persistent anxiety, difficulty concentrating or thinking, persistent disturbance of mood or affect,

vigilance and scanning, manic syndrome, emotional lability, autonomic hyperactivity, sleep

disturbance, and panic attacks, among others.  Regarding Gay's ability to perform work

activities, Skul opined that Gay's abilities were "limited but satisfactory" in remembering work

like procedures and understanding, remembering, and carrying out short and simple instructions

as well as detailed instructions.  He had "no useful ability" to maintain attention for two-hour

segments, maintain regular attendance, sustain an ordinary routine without special supervision,

work in coordination with or proximity to others without being unduly distracted, and perform at

a persistent pace without an unreasonable number of rest periods.  He had no useful ability to

interact appropriately with the general public and maintain socially appropriate behavior.  He

was unable to leave the house due to anxiety and agoraphobia and would miss more than four

days of work a month.  He would be able to manage any benefits in his own best interest.  He

was not a malingerer and Nurse Skul commented that he had one of the worst cases of authentic

anxiety disorder she had seen.

### 2. Consultative Examiner

On March 14, 2016, Gay saw psychologist Ronald Smith, M.D., for a consultative exam.

Tr. 292-298.  Gay stated that he had become really ill three years ago.  He had been working in

landscaping, eventually started missing work due to his symptoms, and finally had to quit.  Some

days he was not very nice because he had racing thoughts, could not concentrate, and was jumping ahead in his thinking.  He began taking medications in January and at the time of his exam he was taking Zyprexa, Prozac, Lamictal and Xanax.  His medications were helpful; they helped him sleep and Xanax made him "not really care."  His wife stated that his mood was better and he was less irritable.  Even so, he still woke up with nausea and vomiting about four days a week, especially if he had to go somewhere.  He had good days and bad days, which included crying spells.  As for hobbies, he liked to walk, but he walked (about a mile) in the dark because he thought people were watching him.  He stated that he helped around the house doing dishes, vacuuming, taking out the trash and doing yard work.  When asked about eating out, Gay stated that he went to a restaurant recently but instead of staying, he and his wife had their meal boxed to go because he felt anxious.

Dr. Smith observed that Gay appeared anxious and that his right leg bounced throughout the interview.  He was cooperative and related well.  He had a neat appearance, showed appropriate affective expression, and displayed well-organized thinking.  He displayed good contact with reality and had intact fund of knowledge, memory, judgment, insight, and ability to perform basic calculations.

Dr. Smith's impression was major depressive disorder, in partial treatment remission, and generalized anxiety disorder.  He opined that Gay is capable of understanding, remembering and carrying out job instructions but will be compromised by high levels of anxiety especially when he has to leave the house or be around others.  He may have difficulty maintaining adequate attention and concentration and maintaining persistence and pace when performing simple or more complex tasks, due to his difficulty staying focused, having episodes of racing thoughts, and high levels of anxiety when he works or has to be around others.  He will probably relate

appropriately to supervisors but will have difficulty dealing with others in a job situation. Dr. Smith noted that, at Gay's last job, he was given special assistance by being sent out to jobs with only one other person to work with. Finally, Dr. Smith opined that Gay will have difficulty dealing appropriately with work pressures that occur in a job setting because of continuing depression and high levels of anxiety.

### 3. State Agency Reviewing Physicians

On March 25, 2016, state agency reviewing physician Dr. Bergsten, Ph.D., reviewed Gay's file and concluded that his anxiety disorder did not satisfy the paragraph B criteria of Listing 12.06 because he had only mild restriction in his activities of daily living, moderate difficulties in social functioning and in concentration, persistence, or pace, and no repeated episodes of decompensation; nor did his anxiety disorder satisfy the paragraph C criteria of Listing 12.06. Regarding his RFC, Dr. Bergsten opined that he had moderate limitations in interacting appropriately with the public, getting along with coworkers, and maintaining socially appropriate behavior and adhering to basic standards of neatness. Tr. 82. He could react appropriately to supervisors but will have difficulty dealing with others in a job situation due to anxiety. Tr. 82. He had moderate limitations in maintaining concentration for extended periods and would have problems dealing appropriately with work pressures due to ongoing depression and high levels of anxiety. Tr. 81-82.

On June 30, 2016, state agency reviewing physician Dr. Swain, Psy.D., affirmed Dr. Bergsten's opinion that Gay did not satisfy the criteria of Listing 12.06, and further found that Gay could carry out simple and routine one-to-three step tasks in an environment with low production quotas and flexible time constraints, with occasional and easily explained changes, and could have occasional and primarily superficial interaction with the general public and

coworkers.  Tr. 93-94, 98-99.

### D.  Testimonial Evidence

#### 1. Gay's Testimony

Gay was represented by counsel and testified at the administrative hearing.  Tr. 28.  He has a driver's license and is able to drive.  Tr. 28.  He takes his truck out for a drive around the block about every two weeks so it doesn't freeze up.  Tr. 29.  Otherwise, he does not drive anywhere, his wife drives him.  Tr. 33.  When he drives, he feels "off balance" and "real sketchy."  Tr. 33.  He barely leaves the house.  Tr. 29.  When asked about going to doctor appointments, running errands, etc., Gay stated that his wife usually does all the shopping.  Tr. 29.  He went to the drug store the other day and got sick from anxiety.  Tr. 29.

Gay stated that, when he previously worked full time as a landscaper, he worked with just one other person.  Tr. 29, 31.  About three years prior to the hearing, his anxiety got so bad that he could no longer work.  Tr. 30.  He had always had anxiety but it reached a point where "I don't even know what I'm doing."  Tr. 30.  He does not know why it started getting worse.  Tr. 31.  He is on medication for his anxiety.  Tr. 31.  When asked if the medication worked, Gay replied, "We're still playing with the meds."  Tr. 31.  He stated that Valium helped a little bit (he had taken one that morning) "but I'm still bouncing."  Tr. 31.  When he first started taking Valium it helped, but "after a while it's just become daily life."  Tr. 48.  He cycles equally between anxiety and depression in the course of a week.  Tr. 49.  When he has racing thoughts and more energy, he paces in the house.  Tr. 49.

Gay has been seeing his counselor, Ms. Skul, for two, maybe three years.  Tr. 31-32.  He sees her every three weeks.  Tr. 37.  She also prescribes his medication; he listed the medication he is on and states that his wife sorts them for him because there are so many and he gets

confused about what to take when.  Tr. 32.  His wife drives him to his counseling appointments.

Tr. 33.  The other day he drove to the store, went inside, and threw up in the aisle after about

four minutes due to anxiety or a panic attack.  Tr. 33-34.  When he has a panic attack, he goes up

to his room with his medication and tries to calm himself down.  Tr. 34.  His other symptoms

included his throat getting dry and feeling like it is closing up; he stated that his throat was dry at

the hearing.  Tr. 34.  Also, he can't focus on anything; his mind is racing.  Tr. 34-35.  He cannot

identify something that precipitates it; some days he wakes up with his mind racing and other

days he is depressed.  Tr. 35.  He also has panic attacks at home for no apparent reason.  Tr. 35.

They just come and go.  Tr. 35.  On average, Gay stated that his panic attacks last for about 4

hours and he has about 8-10 per week.  Tr. 36.

When Gay's attorney observed that Gay had been wearing dark sunglasses in the waiting

room prior to the hearing, Gay explained that he feels like he is being watched all the time and

the dark glasses help him feel a little bit more in control.  Tr. 37.  He also wears them during

doctor appointments and when he goes to the store.  Tr. 37.  When asked how his concentration

and ability to maintain focus has been affected, Gay stated that he has no focus.  Tr. 37.  When

he tries to think about "what's going down," his mind starts racing or he will get badly

depressed.  Tr. 37.  His medication helps him sleep at night, although he had difficulty staying

asleep.  Tr. 38.  He uses a CPAP machine and gets about six hours of sleep a night.  Tr. 45.

Gay lives with his wife and when she is at work he is mostly depressed and waiting for

her to get home.  Tr. 40.  The only household chore he does is mow the grass, which should take

about 45 minutes but takes him about 4 days because he feels like people are watching him when

he goes outside in the yard.  Tr. 40.  He does not do any other chores but not because he is

unable to do them; his wife does them.  Tr. 41.  He does not go to family gatherings because he

will "freak out." Tr. 41-42. He last visited his parents, who live in Southern Ohio, about a year prior to the hearing and it did not go well. Tr. 42. "Everyone was there" and it was overwhelming with "that many people around." Tr. 42. He has two friends that stop in to check on him for a few minutes every two weeks. Tr. 42-43.

Gay stated that he showers and puts on clean clothes about every week and a half. Tr. 43. On a typical day, he sits and listens to the radio and thinks about when he's going to cut the grass. Tr. 43. He doesn't really watch television, although he'll check the news every now and then. Tr. 43. He goes online to pay bills. Tr. 44.

When asked about the source of his depression, Gay stated that he does not know, it just comes and goes. Tr. 45. The ALJ referenced the consultative examination notes from Dr. Smith in April 2016, wherein Gay stated that he gets up and goes for a daily, mile-long walk; takes a shower upon his return home; helps with dishes and vacuuming; and takes out the trash. Tr. 46. Gay stated that he does not walk out of the house and he does not know why the treatment note says so. Tr. 47. He also stated that he did not do more household chores then, at the time of Dr. Smith's exam about 1 ½ years ago, than he does now. Tr. 47. He did not do dishes at that time, although he used to do them before he got married about two or three years ago. Tr. 47. He and his wife had their marriage ceremony in his house. Tr. 47.

### 2. Gay's Wife's Testimony

Gay's wife also testified at the hearing. Tr. 53. She testified that they had been married about 1.5 years and that the wedding ceremony took place in the house. Tr. 53. The only other person present was the officiator. Tr. 53. She stated that the last time Gay left the house to go somewhere, other than driving his truck every few weeks to keep it moving, was a few weeks ago when there was a problem with the furnace filter that "took over the fear of leaving the house

14

for that moment." Tr. 54. However, he came home without having gotten the filter; he threw up in the store. Tr. 60.

When they married, Gay's conditions weren't as severe as they are now. Tr. 55. She does not feel that the counseling and medications have improved his condition. Tr. 58. She thinks he has difficulty with side effects of the medications. Tr. 59. His doctor has basically told her that she is keeping him out of the hospital. Tr. 59. He has suicidal thoughts and they have had to remove guns from their house (Gay is a hunter). Tr. 59.

### 3. Vocational Expert's Testimony

A Vocational Expert ("VE") testified at the hearing. Tr. 64-70. The ALJ discussed with the VE Gay's past relevant work as a groundskeeper. Tr. 66-67. The ALJ asked the VE to determine whether an individual with Gay's vocational profile could perform his past work or any other work if he had the limitations subsequently assessed in the ALJ's RFC determination, which are set forth below. Tr. 67-69. The VE answered that such an individual could not perform Gay's past work but could perform the following jobs with significant numbers in the national economy: sexton, cleaner II, and hospital cleaner. Tr. 68.

### III. Standard for Disability

Under the Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability. "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in

the national economy . . . .

42 U.S.C. § 423(d)(2).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1.    If claimant is doing substantial gainful activity, he is not disabled.

2.    If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.    If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4.    If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work.  If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.    If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920;[1] *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).

Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.

*Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the

Commissioner at Step Five to establish whether the claimant has the vocational factors to

perform work available in the national economy.  *Id.*

---

[1] The DIB and SSI regulations cited herein are generally identical.  Accordingly, for convenience, further citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 et seq.  The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq., corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds to 20 C.F.R. § 416.920).

## IV. The ALJ's Decision

In his December 5, 2018, decision, which the Appeals Council adopted (Tr. 5-6), the ALJ

made the following findings:

1. The claimant meets the insured status requirements of the Social Security Act through June 30, 2020.  Tr. 108.

2. The claimant has not engaged in substantial gainful activity since May 6, 2015, the alleged onset date.  Tr. 108.

3. The claimant has the following severe impairments: mood disorder and anxiety-related disorders.  Tr. 108.

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.  Tr. 110.

5. The claimant has the residual functional capacity to perform a full range of work at all exertional levels, but with the following nonexertional limitations: he is limited to simple, routine tasks with no strict time demands, no strict production quotas, only simple work instructions and decisions, and no more than occasional changes in the work setting; and he is limited to no direct work-related interaction with the public, occasional interaction with supervisors, and occasional and superficial interaction with coworkers.  Tr. 111.

6. The claimant is unable to perform any past relevant work.  Tr. 113.

7. The claimant was born in 1972 and was 42 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date.  Tr. 114.

8. The claimant has at least a high school education and is able to communicate in English.  Tr. 114.

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferrable job skills.  Tr. 114.

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.  Tr. 114.

11.     The claimant has not been under a disability, as defined in the Social Security Act, from May 6, 2015, through the date of this decision.  Tr. 115.

## V. Plaintiff's Arguments

Gay argues that substantial evidence does not support the ALJ's findings at step three and that he failed to discuss a treating source opinion.  Doc. 14, pp. 13-21.

## VI. Law & Analysis

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.,* 889 F.2d 679, 681 (6th Cir. 1989) (per curiam) (citations omitted)).  A court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility."  *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

### A. The ALJ did not err at step three

Gay argues that the ALJ erred in his analysis of Listing 12.06, anxiety and obsessive-compulsive disorders, at step three.  He complains that the ALJ did not discuss the paragraph A criteria and was "selective in his analysis," neglecting portions of the record favorable to Gay.  Doc. 14, pp. 13-14.

At step three of the disability evaluation process, a claimant will be found disabled if his impairment(s) meets or equals one of the listings in the Listing of Impairments.  20 C.F.R. §

18

404.1520(a)(4)(iii).  The claimant bears the burden of establishing that his condition meets or equals a listing.  *Thacker v. Soc. Sec. Admin.*, 93 Fed. App'x 725, 727-728 (6th Cir. 2004) (citing *Buress v. Sec'y of Health & Human Servs.*, 835 F.2d 139, 140 (6th Cir. 1987)).  Thus, a claimant "must present specific medical findings that satisfy the various tests listed in the description of the applicable impairment or present medical evidence which describes how the impairment has such equivalency."  *Thacker*, 93 Fed. App'x at 728 (citing *Evans v. Sec'y of Health & Human Servs.*, 820 F.2d 161, 164 (6th Cir. 1987)).  "Each listing specifies the objective medical and other findings needed to satisfy the criteria of that listing" and a claimant "must satisfy all the criteria to meet the listing."  *Reynolds v. Comm'r of Soc. Sec.*, 424 Fed. App'x 411, 414 (6th Cir. 2011) (internal quotation marks omitted).

To satisfy Listing 12.06, a claimant must demonstrate the paragraph A and B criteria or the paragraph A and C criteria.  20 C.F.R. Part 404, Subpart P, Appendix 1, Pt. A2.  Here, the ALJ discussed the paragraph B and C criteria and found that Gay did not demonstrate either criteria and did not, therefore, meet or equal Listing 12.06.  Tr. 110.  Gay's assertion that the ALJ erred because he did not discuss the paragraph A criteria fails because the ALJ explained that Gay did not demonstrate the remaining required criteria.  *See Webb v. Comm'r of Soc. Sec. Admin.*, No. 1:19-cv-123, 2019 WL 7944404, at *19 (N.D. Ohio Oct. 21, 2019) (ALJ did not err when failing to discuss the paragraph A criteria because the ALJ found the claimant did not establish the paragraph B or C criteria).[2]

To satisfy the B criteria, a claimant must show that he has extreme limitations in one of four areas of functioning or marked limitations in two or more areas of functioning.  20 C.F.R. Part 404, Subpart P, Appendix 1, Pt. A2, §12.06.  The ALJ found that Gay did not demonstrate the paragraph B criteria because he had only moderate limitations in all four areas of

[2] Report and recommendation adopted, 2019 WL 6695828 (N.D. Ohio Dec. 9, 2019).

19

functioning: understanding, remembering, or applying information; interacting with others; the ability to concentrate, persist, or maintain pace; and the ability to adapt or manage oneself.  Tr. 109.

Gay argues that substantial evidence shows that he has marked limitations in the functional area of interacting and relating to others.  Doc. 14, p. 15.  He asserts that, while he "may be cooperative and friendly to his medical providers, the record proves Plaintiff overall has marked limitations in interacting with others, due to his chronic and severe anxiety."  Doc. 14, p. 15.  In support, Gay cites treatment notes indicating that he relayed to a provider that he takes walks early in the morning to avoid people and he feels that people are watching him, he cannot tolerate being in public areas, his visits with family were cut short due to his anxiety, and that Dr. Smith, the consultative examiner, opined that he would have difficulty dealing with others in a job situation.  Doc. 14, pp. 15-16.  But Gay's regular visits to medical providers are not inconsequential; it is evidence that he can tolerate being in public areas.  And during those visits he was found to be cooperative and relate well, with an appropriate affect, and was attentive and friendly, as the ALJ observed.  Tr. 109.  The ALJ also recognized that he had been found to have some agitation, anxiety, and inappropriate laughter, thus concluding that he had moderate limitations in the area of interacting and relating to others.

Regarding Gay's visits with family that he states were "cut short" due to his anxiety, the records he cites do not show that these visits were cut short.  See Tr. 637 (April 2017 treatment note: "went to visit family over the weekend and forgot his medication"); Tr. 552 (November 2015 treatment note: "He went to Southern OH to visit family and returned after 2 ½ days."  The note does not indicate the length of time Gay intended to stay).  Moreover, these visits are evidence that Gay does leave his house despite his anxiety and assertions to the contrary.  With

respect to Dr. Smith's opinion that Gay "would have difficulty dealing with others in a job setting," (Tr. 297), the ALJ accurately remarked that Dr. Smith's conclusions were "somewhat vague" and gave his opinion limited weight, a finding that Gay does not contest.  Tr. 112.

Lastly, Gay contends that his counselor, Ms. Skul, opined that he cannot be expected to work in coordination with or proximity to others without being unduly distracted and had no useful ability to interact appropriately with the general public or maintain socially appropriate behavior.  Doc. 14, p. 16 (citing Tr. 687-688).  But the Appeals Council considered Skul's opinion (as detailed more fully below) and found that her opinion was entitled to little weight. Tr. 5.  It explained that records indicate that Gay is able to do all of the following: attend medical appointments, go to court, go to family members' houses, go for walks around the neighborhood, go to the store to pick up his medication, and go to a restaurant to pick up food.  Tr. 5.  The Appeals Council also commented that Gay's treatment records with Skul showed normal eye contact (despite Skul opining that he had "poor" eye contact) and that, although on a few occasions he was found to have an anxious or depressed mood and shaking/restlessness, primary care records consistently noted normal mental status.  Tr. 5.  Gay does not contest these findings. Substantial evidence supports the ALJ's finding that Gay has moderate limitations in interacting and relating to others.

Gay also argues that substantial evidence shows that he has marked limitations in the functional area of maintaining concentration, persistence and pace.  Doc. 14, p. 15.  The ALJ stated that treatment notes showed moderate limitations in this area, with no contradictory evidence.  Tr. 109.  Gay asserts that the record the ALJ cited, a note from a visit with Nurse Harrison, noted that Gay's concentration and memory are "significantly" impaired, not "moderately" impaired.  Doc. 14, p. 17 (citing Tr. 380).  But Harrison's treatment note does

indeed list Gay's concentration as "moderately" impaired under the "mental status assessment" section of the record, while the "mental status summary" section of that same note states that Gay's "concentration and memory are both significantly impaired." Tr. 380. It was not error for the ALJ to characterize Gay's concentration as moderately impaired, as that is what Harrison assessed. At most, there is an internal inconsistency in Harrison's treatment note. Gay does not identify any other evidence in the record wherein any provider indicated that he had more than a moderate impairment in concentration.

Gay cites Dr. Smith's opinion as additional evidence in support of his assertion that he has a marked impairment in concentration, but the ALJ discounted Dr. Smith's opinion, as previously noted, and Gay does not challenge the ALJ's finding. So, too, with respect to Nurse Skul's opinion. Moreover, Dr. Smith did not find Gay to have difficulty concentrating during the exam. See Tr. 296.

Finally, Gay argues that he meets the paragraph C criteria. Doc. 14, p. 17. To establish the paragraph C criteria, a claimant must show a serious and persistent mental disorder that has lasted over a period of at least 2 years, evidence of both treatment or a highly structured setting that is ongoing and that diminishes the symptoms and signs of the claimant's mental disorder, and that the claimant has a minimal capacity to adapt to changes in his environment or to demands that are not already part of his daily life. 20 C.F.R. § Pt. 404, Subpt. P, App. 1, Pt. A2, § 12.00G (outlining the paragraph C criteria). The ALJ found that the record did not support a finding that Gay had a minimal capacity to adapt to changes in his environment or to demands that are not already part of his daily life. Tr. 110.

Gay asserts that the ALJ did not cite any exhibits when finding that he did not meet the paragraph C criteria. Doc. 14, p. 17. However, this does not describe an error, as there is no

heightened standard of articulation at step three.  *Bledsoe v. Barnhart*, 165 Fed. App'x 408, 411 (6th Cir. 2006).  Gay argues that there are repeated references to Gay being confined to his home (Doc. 14, p. 19), but Gay was not confined to his home; both the ALJ and the Appeals Council found that the evidence indicated that Gay did leave his home more often than he had alleged. Gay states that the evidence shows that he is unable to function outside his home, but the ALJ and the Appeals Council cited evidence indicating that Gay could function outside his home. See, e.g., Tr. 5 (Appeals Council commenting that Gay attended medical appointments with normal mental status findings and could go to court, visit family members' homes, pick up medication from a store and food from a restaurant, etc.).  Gay does not present specific medical findings that satisfy paragraph C criteria, and his objections to the ALJ's decision, therefore, fail. *See Thacker*, 93 Fed. App'x at 728 (A claimant "must present specific medical findings that satisfy the various tests listed in the description of the applicable impairment or present medical evidence which describes how the impairment has such equivalency.").

### B. Gay does not describe an error with respect to Nurse Skul's opinion

Gay argues that the ALJ erred because he did not consider the opinion of his counselor, Nurse Skul.  Doc. 14, p. 19.  While true that the ALJ did not discuss Nurse Skul's opinion, the Appeals Council granted Gay's request for review of the ALJ's decision and did discuss Nurse Skul's opinion.  Tr. 4-6.  The Appeals Council's decision is the final decision of the Commissioner, and, therefore, the operative decision this Court must review.  Because the Appeals Council considered Nurse Skul's opinion, Gay has not described an error and his argument is without merit.

## VII. Conclusion

For the reasons set forth herein, the undersigned recommends that the Commissioner's decision be **AFFIRMED**.

Dated: December 4, 2020

*/s/Kathleen B. Burke*

Kathleen B. Burke
United States Magistrate Judge

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). *See also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).